CHARLES M. STEPHENS, APPELLANT, v. CIVIL SERVICE COMMISSION OF NEW JERSEY AND CAROL W. DAINES, RESPONDENTS.

Submitted November 7, 1924—Decided January 19, 1925.

An army field clerk, serving by employment of the secretary of war, under authority of the act of August 29th, 1916 (39 *U. S. Stat. L.* 668), and of the act of July 9th, 1918 (40 *Id.* 852), is not a "soldier" within the meaning of that term, as used in chapter 298 of the laws of 1920 (*Pamph. L.* 1920, *p.* 540), and such a one cannot, therefore, avail himself of the preference in appointment to public office made mandatory by the terms of said chapter 298.

---

On appeal from the Supreme Court, whose *per curiam* is printed in 2 *N. J. Mis. R.* 621.

For the appellant, *Ernest L. Quackenbush.*

For the Civil Service Commission of New Jersey, *Edward L. Katzenbach,* attorney-general.

For the respondent Carol W. Daines, *Frank A. Matthews, Jr., Randal B. Lewis* and *Philip Forman.*

The opinion of the court was delivered by

CLARK, J.  C. M. Stephens, the prosecutor of the writ of *certiorari,* the dismissal of which by the Supreme Court is here appealed from, is carrying on the work of chief probation officer of the Court of Common Pleas of Bergen county. He received a temporary appointment thereto at the hands of the judge of that court on June 1st, 1923. This office, by section 14 of chapter 156 of the laws of 1908 (*Pamph. L.* 1908, *p.* 243), and the regulations of the civil service commission formulated thereunder, comes within that class of offices which must be filled as the result of a competitive examination.  Accordingly, such an examination was held on November 10th, 1923, in which Stephens, the defendant Charles W. Daines, and two other persons participated. The eligible roster of the commission shows ratings in this examination as follows: Groh, eighty-three per cent.; Daines, eighty-two and sixty-nine hundredths per cent.; Stephens, eighty-one and fifty-seven hundredths per cent., and shows that the fourth person failed to pass.

Section 21 of the laws of 1908 (*Pamph. L.* 1908, *p.* 248), declares that the three standing highest on the register shall be certified as eligible for appointment.  By an amendment to this section, chapter 298 of the laws of 1920 (*Pamph. L.* 1920, *p.* 540), the legislature, however, qualified section 21 and provided that:

"If one of the three so certified shall be an honorably discharged soldier, sailor or marine of the United States who was in the military or naval service of the United States in any war in which this country has been engaged, then the said head of such department, office or institution shall select such honorably discharged soldier, sailor or marine."

The civil service commission construed this amendment to include an army field clerk, and certified the three names to the Common Pleas judge, together with an order to him that defendant Daines, as an honorably discharged soldier, must receive the appointment as chief probation officer. The record becomes slightly confused at this point. Apparently, however, upon Stephen's refusal to vacate the office, defendant Daines was appointed and the writ of *certiorari* sued out. Th prosecutor contended in the court below, and now urges upon this court, first, that an army field clerk is not a soldier, and that the defendant, therefore, does not come within the description of chapter 298 of the laws of 1920, *supra,* and, second, that even if he does, said proviso is in violation, both of the fourteenth amendment of the federal constitution and of article 4, section 7, paragraph 4 of the state constitution.

Concededly, Daines served as an army field clerk from May 28th, 1918, to December 2d, 1919, at a salary (including commutation of quarters, &c.) of approximately $1,200 per annum, and in such service was occupied principally in the work of compiling records, by photography, finger prints, &c., of the troops leaving the various ports of embarkation for France. Obviously, he was not a sailor or marine. Was he then a soldier in the sense in which that word is used in the statute? We think not, and are therefore constrained to reverse the judgment of the Supreme Court.

The general principles of statutory construction applicable are well established and can be briefly stated. In assisting us to arrive at the intention of the legislature, we are permitted to consult the statutes of the United States, of our own state, and such records of the government departments involved as are properly matters of judicial notice. In so doing, we are both tracing the history of the legislation on the subject (36 *Cyc.* 1148), and availing ourselves of executive—or, as it is sometimes called, "departmental"—construction. *United States* v. *Cerecedo,* 209 *U. S.* 338; *State* v. *Kelsey,* 64 *N. J. L.* 1. Moreover, since the military service is unquestionably a "trade or profession," we are entitled to consider the opinions of those qualified to speak thereon as to the meaning

of a "term of art" so fundamental to that profession.    36 *Cyc.* 1118.

These are the sources from which we seek to arrive at the legislative intention.    We are, however, further interested in whether our ultimate construction of the statute should be strict or liberal.    We think it should be strict, and for two reasons:  First, it is fundamental that a proviso in a statute, inasmuch as it purports to withhold something from the terms thereof, should be strictly construed.    *Ryan* v. *Carter,* 93 *U. S.* 78, 83.    Moreover, in our view, only a strict construction is consonant with giving full effect to every one of the terms of the statute.    The legislature might well have omitted to qualify the phrase "military service" by the addition of the word "soldier."    Several instances of the use of such broad language by our legislature are in the acts awarding a bonus (*Pamph. L.* 1920, *p.* 318), a medal (*Pamph. L.* 1918, *p.* 711), a preference as to chiropractic examinations (*Pamph. L.* 1923, *p.* 341), and exemptions from the payment for real estate licenses.    *Pamph. L.* 1924, *p.* 54.    Similar instances occur in the statutes of the United States in the award of the bonus (40 *U. S. Stat. L., p.* 1151), Adjusted Compensation act (41 *U. S. Stat. L., p.* 182), and the act concerning the sale of liquor.    40 *U. S. Stat. L., p.* 82.    Or, on the other hand, army field clerks might have been included in the statute by name.    This was done in the case of nurses, as to a bonus, by our legislature (*Pamph. L.* 1920, *p.* 318), and as to preference in *Pamph. L.* 1922, *p.* 98, and in the case of the capture of nurses and army field clerks, by congress.    40 *U. S. Stat. L., p.* 1321, and see *Bannister* v. *Soldiers Bonus Board* (*R. I.*), 112 *Atl. Rep.* 422.    The fact that the legislature has not seen fit to use such general language and has not specifically mentioned an army field clerk, must then, also influence our decision in favor of strict construction. By the same token, also, the necessity for our giving some effect to the limiting term "soldier" makes it beyond the scope of this decision to pass upon the question of whether an army field clerk is in the military service.    We are only deciding that he is not a soldier in such service.

At the outset, we wish to make it clear that our decision in the case at bar is not intended and is not to be interpreted as a reflection, either upon the defendant personally, or upon the status of army field clerks generally. From the evidence, it appears that Mr. Daines was 47 years old on July 9, 1918, and therefore two years beyond the maximum age prescribed by the amendment to the Selective Service act of that date. 40 *U. S. Stat. L., p.* 77. His entering the service in any capacity is, we think, highly to be commended. Further than that, of course, the purpose of the selective service laws and the theory of a nation in arms, so eloquently expressed by President Wilson, does not differentiate the kinds of service performed in the advancement of the war, whether it is as chairman of the war industry board or as a private soldier in the trenches in France. Our feeling in the matter has been expressed in an opinion of the judge advocate general of the army, as follows:

"Our armies in campaign always have with and serving them a large number of civil employes. They are not an unimportant part; in fact, they may truthfully be said to be a necesary part of our military operations. Courage, fidelity and trustworthiness are required of them, but their relation to the nation waging the campaign is one of employer and employee. It is a private contract relation. They serve the army, but they are not in it nor of it." *Dig. Op. Judge Adv. Gen.* (1918), *p.* 525.

The unsatisfactory status of army field clerks in being "neither fish, flesh nor good red herring," seems to have been recognized by congress, because *section 4 A of the National Defense act of June,* 1920, discontinued them, and by that act the rank of warrant officer, as to whose status there is less question, was borrowed from the organization of the navy and substituted for that of army field clerk. 41 *U. S. Stat. L., p.* 760.

The learned counsel for respondent have quite properly attempted to show by a series of "deadly parallels" that the privileges and obligations of an army field clerk are similar to those of others in the military service, about whose status

as soldiers they conceive there is no question. We have been to some pains in our investigation of these alleged similarities, and, unfortunately, upon analysis they seem to us to lead to a conclusion quite contrary to that in support of which they are advanced. Dealing with them individually, we find either that the procedure is so broad in its application as to include those manifestly not soldiers, or else that the similarity is more apparent than real.

Thus, inoculation and vaccination are prescribed, not only for army field clerks, but for civilian employes as well. *W. D. Special Regulation* 28. Even more significant, instead of the required physical examination suggested in the testimony being that of the ordinary applicant for enlistment, specific exemptions are made wherein army field clerks are allowed to fall below the ordinary standard in both vision and the condition of the legs and feet. *W. D. G. O.* 52. So, also, the award of the victory medal and silver service chevron, on which emphasis was laid, is, under war department orders (*Army Regulations* 600, *January 30th,* 1922), awarded as well as to army field clerks specifically, to members of the nurse corps, contract nurses, pay clerks, contract surgeons, &c. In a somewhat novel application of the principle that the clothes make the man, defendant has argued that the similarity in the uniform, which is one of color chiefly, is pertinent. This also is provided for by a regulation specifically applying to army field clerks. *W. D. Special Regulation* 41. The collar ornament prescribed is crossed pens. (We refrain from the appropriate quotation.) A similar regulation prescribed the uniform for field secretaries in the Young Men's Christian Association. *Y. M. C. A. Official Publication* 1922, *p.* 499.

The officer from the adjutant-general's department, called as an expert witness by the defendant, offered some conclusions, both as to the oath taken by and the honorable discharge of army field clerks. These are in no way borne out by the official records. In respect to the former, the oath prescribed by the form of the adjutant-general's office applicable to field clerks is not that of enlisted men, but is that

prescribed for any persons taking an oath of office under the United States. *U. S. Rev. Stat.*, § 1757; *A. G. O. Form* 591; *W. D. Form* 6. The form of oath prescribed for enlisted men is set forth in the statutes of the United States (39 *U. S. Stat. L., p.* 668), and includes the additional provision that such enlisted men obey the orders of the President and of his superior officers.

There is some question in our minds as to whether an army field clerk is entitled to a discharge at all. There is no statutory provision requiring the same, as is true in the case of enlisted men. 39 *U. S. Stat. L., p.* 668. Only under such provision, or one similar thereto, can a certificate of discharge be demanded. *Cook* v. *Paxton,* 4 *H. & N. (English)* 368. We cannot accede to the view of the defendant's expert that a custom of the service of giving some form of discharge to field clerks and temporary officers, inaugurated for the first time in this war, has acquired the force of military unwritten law. See *Davis Military L.,* § 8. A comparison of form *A. G. O.* 525-4, a field clerk's certificate of dismissal, and form *A. G. O.* 55, the discharge of an enlisted man, indicates the different purposes in the issuance of the two documents. The certificate of an army field clerk or of a temporary officer is evidence that he had been separated from the military establishment under circumstances creditable to himself, and confines itself to a statement of that fact. The enlisted man's discharge, on the other hand, contains his complete record while in the army, together with the opinion of his commanding officer as to the character of his service.

We have already seen that the state bonus and state medal are authorized by different and broader language. So, also, the compulsory allotment of field clerks is under a statute defining an enlisted man as "any person enrolled in the military service of the United States." 40 *U. S. Stat. L., pp.* 401, 407.

Two army field clerks were called in the cause and testified to their service with tactical divisions in France, which divisions were in combat with the enemy. If this were

to be the acid test of a soldier, it would have to include, besides army field clerks, army nurses, war correspondents, civilian employes and the employes of various welfare organizations. All of these are persons serving with the armies of the United States in the field, and come therefore within the terms of the second article of war. The army nurse corps is establish by statute (40 *U. S. Stat. L., p.* 879), and the nurses are employed under contract for three years. *Medical Regulations* 66. Their duties include service with field hospitals under fire. *Medical Regulations, supra.* So, Young Men's Christian Association and similar welfare workers engage themselves under contract, the specific provisions of which require subjection to military rules. *Y. M. C. A. Official Publication, supra.* War correspondents were under bond to their employers, which required of them a similar obedience to discipline. *Annual Report War Department* 1918, *p.* 197. By the second article of war, all persons serving with the armies in the field, in time of war, are subject to military law and discipline. 39 *U. S. Stat. L., p.* 651. This has been interpreted to include even a cook serving on an army transport. *Ex parte Falls,* 251 *Fed. Rep.* 415. A *fortiori,* the application of this article and of the terms of the employment of the classes of person above referred to, might well lead to their service with combat troops. Nor could they escape such service by an appeal to the involuntary servitude amendment of the federal constitution. *Robertson* v. *Baldwin,* 165 *U. S.* 275.

We think that the status of a soldier, and, therefore, the meaning of the word as used in the statute, is a narrow one. It is limited to enlisted men—including those whose enlistment arises as a result of the operation of the Selective Service act (*Bannister* v. *Soldiers Bonus Board, supra*), and, by necessary implication, to those who exercise command over enlisted men. This includes certainly commissioned, and, doubtless, the newly-created warrant officers. (A commissioned officer is one who holds as evidence of his right to office a commission signed by the President, commander-in-chief of the army. *United States* v. *Hendee,* 124 *U. S.* 309.

A warrant officer, on the other hand, holds as evidence of his right, a warrant signed by the secretary of war or navy, as the case may be. *United States* v. *Fuller*, 160 *Id.* 593.)

This is the view taken by the congress of the United States, persuasive because that body only is authorized by the constitution to make war and raise armies. Our first artcles of war, copied almost *verbatim* from the British articles of 1774 (*Tyler* v. *Pomeroy*, 8 *Allen* (*Mass.*) 480), referred throughout to officers and soldiers. So, with the revised articles of 1806. *U. S. Laws, 9th Congress, p.* 35. The first positive definition of the term "soldier" appears in a further revision of the articles of war promulgated in 1874 (*U. S. Rev. Stat.,* § 1342), and is as follows:

"The word 'officer,' as used therein, shall be understood to designate commissioned officers; the word 'soldier' shall be understood to include non-commissioned officers, musicians, artificers and privates, and other enlisted men."

This definition of a soldier has been given the approval of the United States Supreme Court in the case of *United States* v. *Hartigan*, 169 *U. S.* 197. A similar definition occurs in a further revision of the articles of war, published as part of the Appropriation act of 1916. 39 *U. S. Stat. L., p.* 650. Furthermore, the Court-Martial Manual, compiled by the judge advocate general's office, contains significant notes to the sixty-seventh and seventy-fifth articles of war. These articles prescribe the death penalty for failure to suppress mutiny or sedition and for misbehavior in the face of the enemy. The notes thereunder are of no less authority than their principal text. *In re Brodie,* 128 *Fed. Rep.* 665. They specifically exclude army nurses, army field clerks, &c., from the operation of the sixty-seventh and seventy-fifth articles as not coming within the designation officer or soldier. *Court-Martial Manual, pp.* 365, 381.

So, affirmatively, it has been held by executive departments of the government that an army field clerk is not a commissioned officer. *Dig. Op.* (1918) *Judge Adv. Gen.* 159, 781, 1094 (as to the fifty-fifth and fifty-sixth articles of war, *Court Martial Manual, p.* 406). Similarly, it has been declared that he is not an enlisted man. *Dig. Op. Judge Adv.*

*Gen.* (1917), *p.* 155. He pays for his own subsistence and for his own uniform and signs a pay voucher. An enlisted man, on the other hand, is rationed at the expense of the government, his uniform is issued to him and he gets his pay by signing the payroll. Likewise, an army field clerk is given no rank by the army regulations (see *Army Regulations for 1917,* ¶ 7), no provisions are made for his promotion, reduction or transfer (39 *U. S. Stat. L., p.* 166), and he is entitled to exercise no command. See *Court-Martial Manual, p.* 356. In all of these respects he differs both from enlisted men and from commissioned officers.

Counsel for the Civil Service League, in his learned brief, has shown fully the Genesis of an army field clerk. He first appears in the Appropriation act of 1884, wherein pay for clerks, messengers, laborers and charwomen is provided. He recurs in various annual appropriation acts down to the present time. By the act of August 29th, 1916 (39 *U. S. Stat. L., p.* 668), however, his designation seems to have been changed from that of headquarters clerk to army field clerk, and he is by that act made expressly subject to the rules and articles of war. This, it seems to us, is more than a change in name. *Charlebois* v. *United States,* 54 *Ct. of Cl.* 183. His subjection to the articles of war had already taken place under the terms of article 2. 39 *U. S. Stat. L., p.* 151. It may, however, be pertinent to discover whether an army field clerk is in the military as distinguished from the civil service. 31 *Op. Adj. Gen.* 133. The determination of that question is, however, as we have said, not dispositive of the case at bar.

It is to be noted that in each one of these appropriation acts down to and including the act of 1916, congress adds a proviso to the effect that these clerks or field clerks are *employed* by the secretary of war, and are assigned by him to such positions as he sees fit. Some of the confusion which has arisen in respect to the *status* of these army clerks has been, we believe, because of the tendency of the adjutant general's office to ignore this express provision and to consider these individuals as appointed to an office rather than employed in a position. 27 *Op. Adj. Gen.* 493.

It does not seem to us that this limitation of the word "soldier" to enlisted men and those who command them is an arbitrary one. We think, rather, it is in harmony with the historical and popular conception of a soldier as a fighting man. The very word itself comes from the Latin *"solidus,"* a coin used in the payment of those who had been hired to fight, *i. e.,* mercenaries. *Beav. Dict. Ph.* 748. Of course, the complexities of modern warfare have broadened that definition considerably beyond the foot soldier who engaged in physical combat with a similar one of the enemy. Nevertheless, it seems reasonable to believe that the legislature, which was conferring a great privilege upon soldiers (at the expense of the other citizens of the state), intended to require that such privilege be enjoyed only by those whose corresponding obligations might involve them in such combat. In time of war, the President, commander-in-chief of the army, has undoubtedly the power to transfer the enlisted and commissioned personnel of the army at will, and an individual's subjection to such power would, without question, bring him within this ancient conception, because he might be transferred into the fighting forces of the army. The army field clerk, in so far as he is neither an enlisted man nor an officer, could not be so transferred or ordered to perform any duties except those of an army field clerk, which, concededly, do not involve personal contact with the enemy.

Our view of the proper construction of the word "soldier" makes it unnecessary for us to pass upon the constitutional questions raised by the prosecutor. As we have decided that he cannot avail himself of the terms of chapter 298 of the laws of 1920, *supra,* its validity is of no concern to him or to the court at this time.

The judgment is reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, MINTURN, KATZENBACH, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, MCGLENNON, KAYS, JJ. 13.